UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILL PALMER,<br><br>        Plaintiff,<br><br>  v.<br><br>A. LAMARQUE; et al.,<br><br>        Defendants.<br>_____/ | No. C 03-4213 SI (pr)<br><br>**FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW; ORDER** |

Will Palmer filed a pro se civil rights complaint under 42 U.S.C. § 1983 in which he alleged two excessive force claims. The parties waived a jury trial, and the action came on for trial before the court on January 31, 2006 through February 2, 2006. The court heard testimony, received exhibits and heard argument at trial. The court now makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

1.    Force was used twice on Palmer on December 19, 2002 while he was incarcerated at Salinas Valley State Prison ("SVSP").

2.    SVSP is a level IV institution. Level IV is the highest general level of security in California prisons, although security housing units may have more restrictive conditions. Inmates at SVSP generally were allowed to move around the prison without being in handcuffs and without being escorted by a prison guard.

3.    Will Palmer was a level IV inmate and was serving an indeterminate life sentence for convictions for several murders and robberies.

4. Defendants correctional officer ("C/O") Marcelino Valdez, sergeant Nathan Walker, C/O Benjamin Gibbs, lieutenant Gregorio Salazar, C/O Raymond Lebedeff, and C/O Stacy Henley were employed by the California Department of Corrections at SVSP. Valdez, Walker, Salazar, Lebedeff and Henley were assigned to the investigative services unit ("ISU"). The ISU was working on collecting DNA samples from inmates that day. The ISU team members did not personally extract blood or saliva samples, but instead brought inmates to a phlebotomist who collected the samples.

5. Palmer was stopped in a hallway near the law library at about 10:00 a.m. on December 19, 2002 by sergeant Walker and C/O Valdez, who wanted to bring him to the hobby shop to have DNA samples collected from him. (The "hobby shop" moniker was left over from a previous use of the room; on December 19, it was just a room available for various functions.)

6. Sergeant Walker asked for Palmer's identification card. Palmer gave his identification card to Walker, abruptly pulled the card back, and attempted to leave.

7. Sergeant Walker attempted to tell Palmer that they were there to take him for DNA sampling. Walker knew that Palmer had previously refused to submit to the sampling.

8. Palmer failed to comply with orders from Valdez and Walker to stop. Palmer walked into Valdez's outstretched arm three times, trying to walk away from them. After the first and second time he walked into Valdez's arm, Palmer complied with orders to step back.

9. The third time Palmer walked into Valdez's outstretched arm, Valdez and Walker decided to handcuff Palmer. Walker wanted to move Palmer to another area to avoid disrupting a nearby class and decided to handcuff Palmer because of Palmer's irritated demeanor.

10. Walker ordered Palmer to turn around and put his hands behind his back to be handcuffed.

11. Palmer complied initially with the order, but when Walker put his hand on Palmer's shoulder, Palmer swung around quickly and brought his hands up in front of his chest. (Walker explained at trial that his practice of putting his hand on an inmate's shoulder was to gain an advantage if an inmate tried to move. By having his hand on the inmate's shoulder, Walker could more quickly sense movement by the inmate and therefore could obtain control

2

of the inmate sooner.)

12. Valdez perceived Palmer's movement to be a threat to his safety. Walker thought he was going to get hit by Palmer.

13. Both Valdez and Walker grabbed Palmer and attempted to push him to the ground. Palmer pushed back against their efforts to take him to the floor.

14. The three men struggled – Palmer against Valdez and Walker – and moved down the hall and around the corner as the struggle continued. Valdez and Walker pushed Palmer to the floor in the hall.

15. A law librarian saw Palmer pull his identification card back from Walker. A teacher who observed part of the struggle sounded an alarm.

16. Once Palmer was on the ground, he continued to struggle to resist efforts to put handcuffs on him.

17. C/O Gibbs was among the officers responding to the alarm. When Gibbs arrived, Palmer was on the floor but still struggling by moving his body and feet. Gibbs put the handcuffs on Palmer. Gibbs then escorted Palmer to the hobby shop.

18. Walker, Valdez, and Gibbs did not grab Palmer's throat during the struggle. Walker, Valdez and Gibbs did not strike, punch, or kick Palmer before or after handcuffing him.

19. The time between Palmer being pushed to the floor and being handcuffed was about 10-15 seconds.

20. When Palmer arrived at the hobby shop, he was medically evaluated by a nurse. Thereafter, the phlebotomist collected DNA samples from him.

21. Lieutenant Salazar went to the hobby shop that day upon learning that Palmer had complained of staff misconduct. Salazar attempted to interview Palmer, but Palmer refused and said he would only talk to an outside investigator.

22. C/O Victor Hogg was acting as a C facility yard officer that day. He was not a part of the ISU. Hogg went to the hobby shop. Salazar told Hogg the ISU was finished with Palmer and asked Hogg to escort Palmer back to his building.

23.   Hogg replaced one pair of handcuffs with another pair on Palmer. The handcuffs initially on Palmer were from Gibbs, who had put them on Palmer in the hallway. Hogg replaced those handcuffs with his own handcuffs. Hogg gave the removed handcuffs to Salazar.

24.   Hogg escorted Palmer to the C Building where Palmer was housed. When they reached the outside front of the building, Hogg removed the handcuffs from Palmer. At the time, there were other inmates standing outside the building who had been recalled from the yard and were waiting to be pat-down searched before entering the building. Hogg instructed Palmer to get in line with those inmates. Hogg then left without entering the building.

25.   At about 11:30 a.m. that day, defendants Valdez, Gibbs, Lebedeff, Salazar, and Henley as well as the phlebotomist were gathered in an office in the C Building. Sergeant Walker was not in or near the office at the time of the second incident.

26.   Inmates who had been in the yard were returning to their cells. Several inmates walked into the building.

27.   At the time, Valdez was reading paperwork in the office. He heard Palmer say, "so you think you're a big man now," looked up and saw Palmer charging at him.

28.   Palmer rushed into the office and at Valdez. Palmer grabbed Valdez, wrapped his left arm around Valdez's shoulder/neck area and punched him three times.

29.   Gibbs and Lebedeff saw Palmer hit Valdez. They grabbed at Palmer to pull him away from Valdez and push him to the ground to handcuff him. Salazar also grabbed Palmer's shirt trying to pull him away from Valdez. Valdez tried to push Palmer away from him.

30.   Lebedeff, Gibbs and Palmer fell to the ground together. Once on the ground and face-down, Palmer continued to kick and wiggle to avoid efforts by Gibbs and Lebedeff to pull his arms from under his chest. When Palmer's hands were pulled out from under his chest, Gibbs put the handcuffs on Palmer. Leg restraints also were put on Palmer.

31.   When Palmer entered the office, he did so voluntarily. He was not ordered to enter the office and was not pulled into the office. He was not escorted by a prison guard at the time he entered the office.

32.   No defendant hit Palmer with a pepper spray can or any other kind of can.

4

33. Palmer was not purposely shoved into the desk head-first, although he may have hit his head on the desk or other fixed objects as the group fell to the floor in the small office.

34. No defendant punched, kicked, or purposely struck Palmer during the second incident before or after he was handcuffed.

35. The struggle during the second incident took 30 seconds or less.

36. C/O Henley was in the office when Palmer entered but immediately turned her attention to several inmates who were nearby in the rotunda because she was concerned that they might be involved. She yelled at those inmates to get down on the floor and called to the control booth for help. Henley had no physical contact with Palmer.

37. After Palmer was put in handcuffs and leg restraints, he was taken for a medical evaluation. The nurse wrote in her report that Palmer had swelling and an abrasion on the top of his head, the left side of his neck appeared red, and Palmer complained of neck and rib pain. Palmer also had a ½" cut on his head.

38. Palmer's punches caused redness and swelling in the area of Valdez's temple and eye.

39. Lebedeff sustained an abrasion to his chin during the struggle with Palmer.

40. The trial was largely about witness credibility, as the parties presented contradictory versions of each incident. Palmer's felony convictions weigh negatively on his credibility as a witness, although his felon status was not the sole or even primary factor in the court's ultimate view of the relative credibility of the witnesses.

41. The Court finds defendants' version of the first incident credible and Palmer's version largely not credible. Among the factors that persuade the Court of defendants' greater credibility are the following: Uninvolved persons, i.e., a teacher and a law librarian, credibly testified to events consistent with defendants' version of events, even though each saw only part of the incident. Palmer's credibility was weak in part because the story he told at trial differed from his earlier story in the complaint and summary judgment opposition: whereas he earlier suggested he offered no resistance throughout the event, he testified at trial he "exploded after the second time they punched me" and "was resisting being choked." Both these statements

were consistent with Palmer struggling with the guards rather than sustaining the one-sided beating he described earlier and inmate Singleton described at trial.

42. The Court also finds defendants' version of the second incident credible and Palmer's version not credible. Among the reasons the Court believes defendants' version over that of Palmer are the following: C/O Hogg was credible in explaining how Palmer came to be unhandcuffed before he entered the office. Defendants' descriptions of the incident were largely consistent on details but not so well-matched in all details as to suggest that they were testifying from a script. Additionally, the injuries to Valdez's temple/eye area were consistent with having been punched and very inconsistent with Palmer's version of the events. Lebedeff's injuries and Palmer's injuries both were minor and consistent with having been suffered during a scuffle. Lebedeff's injuries were not consistent with having been suffered during a unilateral beating of Palmer. Lastly, Palmer's credibility was weakened because the story he told at trial differed from the story he told in his complaint and at the summary judgment stage: only at trial did he state that the second incident started when he cleared his throat and tried to spit on Valdez.

## CONCLUSIONS OF LAW

1. The court has federal question jurisdiction to decide this action brought under the authority of 42 U.S.C. § 1983. See 28 U.S.C. § 1331.

2. Venue is proper because the events giving rise to Palmer's claims occurred in Monterey County, which is within the Northern District of California. 28 U.S.C. §§ 84(a), 1391(b).

3. To prevail on a claim under 42 U.S.C. § 1983, Palmer must show (1) that a right secured by the Constitution or laws of the United States was violated and (2) that the violation was committed by a person acting under the color of state law. See West v. Atkins, 487 U.S. 42, 48 (1988).

4. All defendants were acting under color of state law during both incidents.

6

5. The Eighth Amendment's prohibition of cruel and unusual punishment is violated when prison officials subject a prisoner to the use of excessive force. In evaluating such a claim, "the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 6-7 (1992). In making this determination, a court may evaluate the need for application of force, the relationship between that need and the amount of force used, the extent of any injury inflicted, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response. Id. at 7; LeMaire v. Maass, 12 F.3d 1444, 1454 (9th Cir. 1993).

6. A prison official who fails to intervene to prevent an Eighth Amendment violation may be held liable under Section 1983. See Robins v. Meecham, 60 F.3d 1436, 1442 (9th Cir. 1995).

7. The only defendants present in the first incident were Valdez, Walker and Gibbs. During the first incident, Valdez, Walker and Gibbs did not use excessive force under the circumstances. The force they used was only that necessary to subdue and handcuff Palmer who had resisted lawful orders to stop and to submit to handcuffs.

8. During the first incident, Valdez, Walker and Gibbs did not act maliciously and sadistically for the very purpose of causing harm to Palmer.

9. During the second incident, Henley used no force on Palmer.

10. During the second incident, no defendant used excessive force under the circumstances. The force used by Valdez, Salazar, Gibbs, and Lebedeff was only that necessary to end Palmer's physical attack on Valdez. The force next used by Gibbs and Lebedeff was only that necessary to subdue and handcuff Palmer, who was resisting efforts to handcuff him.

11. During the second incident, defendants did not act maliciously and sadistically for the very purpose of causing harm.

12. Because the force being used was not excessive in relation to the need for force, no defendant has liability for failing to intervene to stop the use of force.

7

13. Palmer did not establish by a preponderance of the evidence that any defendant violated his rights under the Eighth Amendment to be free from cruel and unusual punishment on December 19, 2002.

14. Under the doctrine of qualified immunity, government officials are immune "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see also Saucier v. Katz, 533 U.S. 194, 201-02 (2001).

15. All defendants are entitled to qualified immunity for their actions because their conduct did not violate Palmer's constitutional rights.

**ORDER**

Having made the above findings of fact and conclusions of law, the court now orders that plaintiff take nothing on his complaint. Judgment will be entered in defendants' favor and against plaintiff. The clerk shall close the file.

IT IS SO ORDERED.

Dated: February 14, 2006

_____
SUSAN ILLSTON
United States District Judge